## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MAKENZIE MARIE JOHNSON,**

     **Plaintiff,**

     **v.**
                                      **Case No. 20-CV-1312-SCD**

**KILOLO KIJAKAZI,**[1]
**Acting Commissioner of Social Security,**

     **Defendant.**

---

### DECISION AND ORDER

---

For several years, Tanika Davis received supplemental security income to help cover expenses needed to care for her minor daughter, Makenzie Marie Johnson, who has high-functioning autism spectrum disorder. Davis stopped receiving the benefits when she got a new job and no longer qualified financially. After Davis stopped working, she reapplied for disability benefits on Johnson's behalf, and Johnson turned eighteen while that application was pending. An administrative law judge denied the claim following a hearing, finding that although Johnson had severe impairments, she had not been disabled before or after she turned eighteen. Davis now seeks judicial review of that decision and an award of benefits, arguing that the ALJ failed to give appropriate weight to the opinions of Johnson's treating psychologists and occupational therapist.

I agree that the ALJ committed reversible error in evaluating the opinions of one of Johnson's treating psychologists. However, because the record does not require a finding of

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021. Accordingly, Kijakazi is substituted for Andrew M. Saul as the named defendant in this action pursuant to Fed. R. Civ. P. 25(d).

disability, I will reverse the decision denying Johnson disability benefits and remand the matter for further proceedings, rather than order an award of benefits.

## BACKGROUND

By two years old, Johnson was still not speaking and was having difficulty with fine motor skills, so Davis enrolled her in speech and occupational therapy services. R. 509.[2] Johnson continued receiving those services the following year in an early-intervention preschool program. At age five, Johnson began kindergarten with an individualized education plan and in a self-contained special education program. Also in kindergarten, Johnson was given an educational diagnosis of autism, though Davis questioned whether she just had attention-deficit/hyperactivity disorder and a mixed anxiety disorder. In 2009, Davis applied for and was awarded supplemental security income on Johnson's behalf. *See* R. 88–89, 114, 124, 133, 202–26. However, the Social Security Administration cut off the benefits a few years later when Davis' income increased. R. 89, 606.

During childhood, Johnson received treatment from several medical professionals. Around 2009, she began seeing a child psychologist, Samantha L. Wilson, PhD. *See* R. 509. Johnson reported to Dr. Wilson over the ensuing years on an as-needed basis to work on strategies for emotional/behavioral self-regulation and enhancement of peer relationship skills. Johnson also regularly saw a pediatrician, Angela L. Baker-Franckowiak, MD, who prescribed Ritalin and Strattera to help manage Johnson's ADHD symptoms. *See* R. 420–24, 509.

In July 2015 (when Johnson was fifteen years old), Dr. Wilson referred Johnson to Katherine R. Burrows, PhD, a pediatric psychologist, for an updated psychological

---

[2] The transcript is filed on the docket at ECF No. 16-1 to ECF No. 16-3.

2

evaluation. R. 504. Dr. Burrows interviewed Johnson and Davis, reviewed pertinent medical records, and administered a series of psychological tests. *See* R. 504–22. In her written report, Dr. Burrows indicated that Johnson had "clinically significant deficits in selected metacognitive aspects of executive function including working memory, planning and organization with regard to approach to problem solving, and organization of work space and materials." R. 505. Testing revealed a Full Scale Intelligence Quotient of 74, putting Johnson in the very low or borderline range of intellectual ability, including a working memory index of 74 (which placed Johnson in the fourth percentile and was obtained after Johnson was given her regular ADHD medications). R. 505–06, 510–19. Dr. Burrows diagnosed Johnson with ADHD, autism spectrum disorder (high functioning Asperger's Syndrome), and a specific learning disorder in mathematics. R. 506. She recommended that Johnson continue her medications and be given environmental and student-centered accommodations in school, including flexibility and creativity in curriculum planning, structured and supervised association with peers, and specialized language therapy services. R. 506–08, 519–22.

Johnson did not see Dr. Burrows again until April 2017, when Davis requested "to explore possibilities for increased support for development of executive functioning related skills and behaviors for Makenzie." R. 552. Davis reported that stress levels were up at home as a result of Davis trying to get Johnson to follow through with tasks like completing her chores, personal hygiene routines, and schoolwork. R. 553. The progress note indicates that Johnson was still seeing Dr. Wilson on a semi-monthly basis. Johnson and Davis filled out adaptive behavior assessment inventories, which yielded scores somewhat lower than expected in light of the 2015 psychological testing. Dr. Burrows provided updated diagnoses of adjustment disorder with anxiety, autism spectrum disorder, and ADHD. R. 554. She gave

3

Davis information about a new in-home skills building program, discussed scaffolding techniques (in which Johnson would be provided just enough support to ensure success at completing a task), and encouraged Davis to speak to Johnson's educational team about developing independent living skills. R. 554–55.

In the meantime, Davis reapplied for SSI on Johnson's behalf in February 2017. R. 22, 229–35. After the Social Security Commissioner denied the application, *see* R. 113–21, Davis contacted Dr. Burrows to gather documentation to support her request for reconsideration, *see* R. 161–63, 606. Davis also asked Dr. Burrows if she would write a brief letter explaining how the results of the adaptive behavior assessment inventories Davis and Johnson completed in April 2017 showed that Johnson was disabled under the Social Security Administration's standards. R. 607. Dr. Burrows agreed to write a letter in hopes that it would help Johnson qualify for SSI; she indicated that she would emphasize in the letter how Johnson's limitations impacted her adaptive functioning on a day-to-day basis. It's unclear if Dr. Burrows ever wrote that letter; if she did, it's not in the record. In any event, the Social Security Administration denied Johnson's application upon her request for reconsideration. *See* R. 122–32. Johnson then requested a hearing before an ALJ. *See* R. 145–47.

In January 2018, Johnson's pediatrician referred Johnson for an occupational therapy evaluation due to a regression in fine motor skills and increased difficulty with self-feeding. R. 607–08. (Johnson had stopped occupational therapy in seventh grade. R. 610.) Johnson presented to Rachel Bullis, OT, for her initial evaluation. *See* R. 607–15. Testing revealed that Johnson, who at the time was months away from turning eighteen, had the motor functioning equivalent to a six- or seven-year-old. R. 611–15. Based in part on those test results, Bullis determined that Johnson would benefit from skilled occupational therapy services for bilateral

4

upper extremity and hand strengthening, bilateral coordination, and body/spatial awareness. R. 614. Throughout 2018 and 2019, Johnson participated in weekly occupational therapy sessions with Bullis and another OT. *See* R. 614, 716–17, 719–27, 729–44, 751–53, 755–84, 789–92.

After Johnson turned eighteen in May 2018, Dr. Wilson referred her back to Dr. Burrows for "several imminent concerns having to do with an increase in anxiety related behaviors, an imminent need for guardianship evaluation, school's request for a re-evaluation of cognitive strengths and weaknesses prior to completion of future educational planning, and an ongoing appeal for social security disability benefits." R. 702. Johnson and Davis presented to Dr. Burrows on May 17, 2018, for an updated history and to discuss current concerns and a preliminary treatment plan. Davis reported an increase in anxiety-related behaviors like pacing, skin picking, and a need to make lists. She told Dr. Burrows that Johnson still struggled with fine motor skills and needed assistance with some personal hygiene tasks. R. 702–03. Academically, Davis indicated that Johnson was on track to graduate the following spring and that she planned to enroll Johnson in small, local technical college after graduation, with hopes that Johnson could slowly earn an associate degree and obtain at least a part-time job. R. 703.

Dr. Burrows then evaluated Johnson over the course of two days: June 14, 2018 (during which Johnson was on her ADHD medications) and June 28, 2018 (when Johnson had not taken her meds). *See* R. 702–12. Dr. Burrows observed that, during the first session, Johnson's motor behavior "was basically unremarkable as was attention and concentration," aside from the fact that she tended to "occasionally distract herself somewhat by incessant chatter." R. 705. During the second session, Johnson appeared somewhat agitated, requested

5

a snack break thirty minutes into the session, tended to rush through the testing, had a poorer reaction for failure, went off on tangents, didn't seem to know basic math facts, and had difficulty processing comprehension questions.

Testing across the two days revealed an FSIQ of 89, including significant improvements in vocabulary knowledge, verbal comprehension, and processing speed. R. 705–09. However, Johnson's working memory score was lower than her score from the July 2015 evaluation (71 compared to 74), placing her in the third percentile in that functional category. R. 707. Also, measures of sustained attention and impulse control remained comparable to previous scores, which were indicative of significant problems. R. 705. Johnson also had significant problems with cognitive flexibility, was significantly below age and grade level in math skills, and had a clinically significant impairment in adaptive functioning. R. 705–06.

Dr. Burrows diagnosed autism spectrum disorder (with significant impairment in adaptive functioning), ADHD (moderate), adjustment disorder (with mixed depression and anxious mood), and a specific learning disorder (with impairment in mathematics). R. 706. She invited Johnson to participate in solution-focused therapy, agreed to complete a form in support of Davis' guardianship application, encouraged Davis and Johnson's educational team to continue working with Johnson on developing her math and independent-living skills, and recommended that Johnson continue with occupational therapy. Dr. Burrows' written report also included several accommodations and behavioral interventions to use with Johnson in school and at home. *See* R. 709–11. For example, Dr. Burrows suggested that Johnson be able to change tasks frequently, be given frequent but short breaks, check in with

her teacher frequently, avoid lengthy tasks, be afforded increased supervision, and be presented information in multiple ways (like verbal instructions paired with visual cues).

As promised, Dr. Burrows completed a form in support of Davis' application to become Johnson's legal guardian. *See* R. 693–96. The form asked Dr. Burrows to rate Johnson's level of functioning in several areas on a four-point scale: "intact," "mild impairment," "moderate" impairment, or "severe" impairment. R. 694. Dr. Burrows indicated that Johnson had intact orientation; a mild impairment in language/communication, memory, reasoning, and other executive functioning; and a moderate impairment in attention/concentration, sensory/motor functioning, and emotional/behavioral functioning. She did not rate any of Johnson's impairments to be severe. Dr. Burrows attached a few pages of the June 2018 evaluation to the guardianship form. *See* R. 697–99.

From October 2018 to January 2019, Johnson met with Dr. Burrows at least six times for individual psychotherapy. *See* R. 714–15, 718–19, 728–29, 737–38, 749–50, 753–55. Johnson and Dr. Burrows discussed transitioning to a new therapist, as Dr. Burrows was retiring in a few months. During the remaining therapy sessions, Johnson did not report any problems at home, at school, or with her boyfriend (whom she had met in taekwondo). However, she did complain about excessive fatigue from participating in too many activities, and she expressed frustration with her mom for pushing her too hard. Johnson also told Dr. Burrows that she had been feeling down and empty about once a month and that, during those times, she didn't want to talk to anyone at school. Dr. Burrows encouraged Johnson to keep a mood journal; they reviewed it together a few weeks later, and Dr. Burrows remarked that Johnson's mood was actually pretty stable. Dr. Burrows noted in their last therapy session

7

together that Johnson had met the initial goals of therapy. She stated, "On the whole Makenzie seems to be doing reasonably well, but will no doubt need extra counseling support as she goes through the transition of graduation and technical college attendance." R. 754.

On July 16, 2019, ALJ Edward Studzinski held an evidentiary hearing on Johnson's disability application. *See* R. 62–112. Davis and Johnson testified at the hearing. *See* R. 88–97, 101–09. So did Dr. Burrows. *See* R. 67–88. Dr. Burrows indicated that she had seen Johnson for the two psychological evaluations, in July 2015 and June 2018, as well as six to eight individual therapy sessions after the latter evaluation. R. 70–77. Dr. Burrows explained that testing during both evaluations revealed "a noticeable deficit" in working memory—that is, Johnson's ability to hold on to information in the moment. R. 78–79. For example, during the first evaluation Johnson had a working memory score of 74, which Dr. Burrows said was "more than two standard deviations below the mean for individuals in [Johnson's] age range." *Id.* Dr. Burrows acknowledged that Johnson's ADHD medications helped her working memory, but she noted that Johnson did not do well on the working memory task with or without her meds. R. 80.

Johnson's lawyer asked Dr. Burrows how Johnson's limitations would manifest in a work setting. She explained that Johnson would have difficulties sticking with simple, repetitive tasks: "[I]f it's kind or boring and repetitive, we're going to lose Makenzie. She's going to need to be brought back to tasks with verbal and/or visual cues, probably both. She'll need a tremendous amount of support to keep her on task." *Id.* According to Dr. Burrows, Johnson's inability to sustain her attention to task is "a hallmark of [her] disorder." *Id.* Dr. Burrows further explained that Johnson would be "substantially" below production rate if she had to perform a simple, repetitive job like sorting, packaging, or assembling items. R. 80–82.

8

"Her anxiety would get in the way," and "[i]f she realizes she's getting behind, . . . she might have very difficult emotional reactions," stated Dr. Burrows. R. 82. Dr. Burrows indicated that it wasn't a question of Johnson's intellect; rather, it was "a problem of fine motor deficit, increased anxiety, the ability to regulate her emotions, working memory deficit, and inability to use language in social context as well as . . . a neurotypical person can do." R. 82–83. Dr. Burrows estimated that Johnson would be more than thirty percent less productive than the average worker. She also suggested that Johnson "would need very frequent breaks and much more . . . vocational support in a [repetitive-type work] setting than a neurotypical person would need." R. 84.

Johnson's lawyer also asked Dr. Burrows about Johnson's issues with fine motor activity. Dr. Burrows indicated that, based on her review of the occupational therapy notes, Johnson's fine motor activity was at about fifty percent capacity—that is, equivalent to a six- or seven-year-old. R. 84–85. She estimated that Johnson would perform at about fifty percent of the norm in jobs requiring dexterity, or even worse when factoring in her likely frustration. R. 85–86. According to Dr. Burrows, Johnson had probably reached her full capability in terms of fine motor activity, so therapy should focus on compensatory, rather than rehabilitative, strategies. R. 86.

The ALJ did not ask Dr. Burrows any questions. *See* R. 62–112.

A vocational expert also testified about Johnson's employment prospects. *See* R. 98–101, 109–11. The ALJ asked whether work was available for a person with Johnson's age (nineteen at the time of the hearing), education (a high school graduate), and work experience (a few part-time jobs with substantial supervision), who was capable of work at all exertional levels but had several postural, environmental, and mental-health limitations (e.g., simple,

9

routine tasks; no more than an average production pace; and only brief and superficial interaction with others). R. 99–100. The vocational expert said that such a person could work as a laundry worker and a factory helper. R. 100. Both jobs would be available, according to the expert, if the person also had some manipulative limitations. R. 100–01. The expert said that the person could not do any full-time jobs if she was absent more than one day per month, was off task more than ten percent of the workday, or needed unscheduled breaks. R. 101. When questioned by Johnson's lawyer, the expert said the hypothetical person could not perform the laundry worker job if she was ten percent less productive than the average worker. R. 110. The expert also explained that both jobs she mentioned required frequent use of the upper extremities. R. 111.

On October 1, 2019, the ALJ issued a written decision denying Johnson's application for disability benefits. *See* R. 19–61. Because Johnson turned eighteen while the application was pending, the ALJ evaluated her claim under both the three-step child disability framework, *see* 20 C.F.R. § 416.924(a), and the five-step adult framework, *see* 20 C.F.R. § 416.920(a). The ALJ concluded that Johnson was not disabled under either standard. At step one, the ALJ determined that Johnson had not engaged in substantial gainful activity since the date Davis filed the most recent SSI application. R. 26–27. The ALJ determined at step two that Johnson suffered from four severe impairments—ADHD, adjustment disorder, learning disorder, and autism spectrum disorder—and that she did not develop any new impairments since turning eighteen. R. 27, 41. At step three, the ALJ determined that Johnson did not have an impairment, or a combination of impairments, that met or medically equaled the severity of a presumptively disabling impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, Part A (applicable to both children and adults) or B (applicable only to

10

children)—i.e., the listings. R. 27–33, 42–47. In evaluating whether Johnson's impairments satisfied the listings, the ALJ discussed in detail Dr. Burrows' psychological evaluations in July 2015 and June 2018.

The ALJ also determined at step three of the child-disability process that Johnson's impairments did not functionally equal the listings. R. 33–41. Specifically, the ALJ found that, prior to turning eighteen, Johnson had a less than marked limitation in four of the six functional domains (acquiring and using information; attending and completing tasks; interacting and relating with others; and moving about and manipulating objects) and no limitation in the other two (caring for herself and health and physical well-being). R. 36–41.

At step four of the adult-disability process, the ALJ determined that Johnson did not have any past relevant work. R. 54. The ALJ determined at step five that, since turning eighteen, there were jobs available in the national economy (e.g., factory helper and laundry worker) that Johnson could perform, as identified by the vocational expert at the administrative hearing. R. 54–55. When assessing Johnson's residual functional capacity[3]—

---

[3] The ALJ's RFC assessment contained numerous limitations, accommodations, and allowances:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work at all exertional levels with no restriction of her ability to lift and/or carry, sit, stand or walk throughout an 8-hour workday. She can use either hand to perform fine or gross manipulation frequently but not constantly, but is incapable of performing either forceful grasping or precision manipulation such as requires the use of tweezers. She is limited to working in non- hazardous environments i.e., no driving at work, operating moving machinery, working on ladders, at unprotected heights, or around exposed flames or unguarded large bodies of water, and she should avoid concentrated exposure to unguarded hazardous machinery such as a punch press and large robotic machinery. She is not capable of work involving complex written or verbal communication. In addition, the claimant is further limited to simple, routine tasks, work involving no more than simple decision-making, no more than occasional and minor changes in the work setting, and work requiring the exercise of only simple judgment. She ought not to perform work that requires multitasking. She could perform work requiring an average production pace, but is incapable of significantly above average or highly variable production pace work. She ought not to perform work that requires significant self-direction. She is further precluded from work involving direct public service, in person or over the phone, although the claimant can tolerate brief and superficial interaction with the

that is, the most she could do despite her limitations, *see* 20 C.F.R. § 945—the ALJ rejected Johnson's (and Davis') account of disabling limitations. *See* R. 48–51. The ALJ explained that he limited Johnson to work requiring the performance of only simple, routine tasks to accommodate Johnson's deficits in working memory. R. 50. The ALJ further explained that he accommodated Johnson's limitations with concentration, persistence, and maintaining pace by precluding her "from work that was performed at a significantly above-average pace or a highly variable production pace"; according to the ALJ, Johnson "was capable of performing work at an average production pace." *Id.* Finally, the ALJ explained that he limited Johnson to only "brief and superficial interaction" with others to accommodate her problems interacting with other people. R. 51.

In assessing Johnson's RFC, the ALJ also weighed the opinion evidence in the record. *See* R. 51–54. Relevant here, the ALJ assigned some weight to the testimony of Dr. Burrows (Johnson's former psychologist) when he determined the severity of Johnson's limitations in concentration, persistence, and maintaining pace. R. 52–53. Despite noting that Dr. Burrows had completed two psychological evaluations, the ALJ found that "Dr. Burrows did not provide much substantive evidence that suggested the severity of the claimant's [impairments] would have precluded her from performing any work activity." R. 52–53. The ALJ noted that Dr. Burrows referred to the results of the 2015 evaluation at the hearing, which the ALJ claimed were "overall lower" than the more recent results from the 2018 evaluation. R. 53. However, the ALJ did not acknowledge—as a chart included earlier in his opinion

---

public, which is incidental to her primary job duties. She ought not to work in crowded, hectic environments. She can tolerate brief and superficial interaction with co-workers and supervisors as is common in unskilled work, but is not to perform teamwork or tandem tasks.

R. 48.

documented—that Johnson's working memory score had actually decreased from 74 (fourth percentile) to 71 (third percentile), *see* R. 44 (citing Exhibits 3F, p. 19 [R. 516]; 9F, p. 8 [R. 707]). The ALJ further noted that Dr. Burrows used the findings obtained during the 2018 evaluation when she completed the form in support of Davis' application for guardianship of Johnson and that, although "[t]he functional areas [on that form] did not directly correlate to the functional domains [used in child disability cases or the criteria used to assess mental disorders in adults] nor were the degree of limitation assessed for each necessarily comparable to those used by the Social Security Administration," it was somehow relevant that Dr. Burrows "did not indicate the impairment was 'severe' in any category." R. 53 (citing Exhibit 8F, p. 5 [R. 694]). The ALJ also wholly rejected the opinions of Johnson's other treating providers: Dr. Wilson (her child psychologist), Dr. Baker-Franckowiak (her pediatrician), and Bullis (her occupational therapist). R. 53–54.

The Social Security Administration's Appeals Council denied Johnson's request for review, R. 1–12, making the ALJ's decision a final decision of the Commissioner of the Social Security Administration, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

On August 25, 2020, Davis filed this action seeking judicial review of the Commissioner's final decision denying Johnson's claim for disability benefits under the Social Security Act, 42 U.S.C. § 405(g). *See* ECF No. 1. District Judge Pepper reassigned the matter to me after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 5, 7, 8. It is now fully briefed and ready for disposition. *See* ECF Nos. 26, 33, 40.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing. A reviewing court will reverse a Commissioner's decision "only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence." *Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). "Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Martin*, 950 F.3d at 373 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, I must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)).

## DISCUSSION

Johnson maintains that the ALJ erred in evaluating the opinions of three of her treating providers. Her main argument is that the ALJ did not give sufficient weight to the medical opinions of her former psychologist, Dr. Burrows. Under the treating source rule that applies to Johnson's claim, an ALJ must give controlling weight to a treating psychologist's

14

opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2); *see also Kaminski v. Berryhill*, 894 F.3d 870, 974 (7th Cir. 2018). "If an ALJ does not give a treating [source's] opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the [treating source's] specialty, the types of tests performed, and the consistency and supportability of the [treating source's] opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citations omitted); *see also* 20 C.F.R. § 416.927(c). In either case, an ALJ must offer "good reasons" to support the weight he ultimately assigns to the treating source's opinion. *See* § 416.927(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted).

Johnson argues that the ALJ erred in evaluating two of Dr. Burrows' specific medical opinions. First, she claims the ALJ did not give good reasons to justify assigning only some weight to Dr. Burrows' opinion that Johnson would have significant issues staying on task and maintaining acceptable work pace. Second, she claims the ALJ failed to address Dr. Burrows' opinion that Johnson would need extra supervision in a full-time work setting. Johnson asks me to reverse the ALJ's decision and award benefits because Dr. Burrows' opinions, once given their proper weight, would result in work-preclusive limitations.

## I.    The ALJ Erred in Weighing Dr. Burrows' Opinion Concerning Johnson's Ability to Concentrate, Persist, or Maintain Pace

Dr. Burrows testified that Johnson would have a very difficult time staying on track with simple, repetitive tasks and that her productivity would be substantially below that of an average worker. The ALJ purported to give this opinion some weight, but ultimately he found Johnson capable of performing work requiring an average production pace. The ALJ appears to have rejected Dr. Burrows' more severe limitation because in his eyes Burrows did not

15

provide sufficient medical findings to support it. But as the ALJ noted in his decision, Dr. Burrows evaluated Johnson twice—first in July 2015 and again in June 2018—and prepared an extensive report of her findings, which the ALJ acknowledged largely mirrored her testimony. While the ALJ criticized Dr. Burrows for referring to the more dated evaluation in her testimony, he failed to acknowledge that Burrows did in fact mention *both* evaluations during the administrative hearing; it was Johnson's lawyer who asked only about the scores during the 2015 testing.[4]

Moreover, in finding that Dr. Burrows' opinion lacked medical support, the ALJ misrepresented the findings of the psychological evaluations. The ALJ claimed that Johnson's overall level of cognitive functioning improved from the 2015 evaluation to the 2018 one. While it's true that Johnson demonstrated improvement in several areas—including her overall FSIQ score—the ALJ omitted that Johnson's working memory score (already the lowest component in the 2015 testing) *worsened* in the intervening years, dropping from 74 (fourth percentile) to 71 (third percentile). This omission is crucial, as Dr. Burrows repeatedly cited Johnson's deficits in working memory as the basis of her opinion concerning Johnson's inability to stay on task. In other words, Dr. Burrows' opinion that Johnson's productivity would be substantially below that of an average worker is well-supported by objective medical testing showing that 97% of similarly aged individuals had a better working memory than she has.

The Commissioner attempts to downplay the 2018 testing results, noting that Dr. Burrows said Johnson's ability to sustain concentration and attention was "basically

---

[4] Perhaps Johnson's lawyer also would have asked about the 2018 scores if the ALJ hadn't hurried his questioning of Dr. Burrows. *See, e.g.*, R. 72–73 (ALJ interrupting Johnson's lawyer the first of several times during his questioning of Dr. Burrows to remind him that they "don't have unlimited time for [the] hearing").

16

unremarkable" during the first day of testing (when Johnson had taken her ADHD medications). The ALJ discussed that finding earlier in his decision but not when weighing Dr. Burrows' opinion. Even if he had—and I am supposed to give the ALJ's decision "a commonsensical reading," *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010) (citation omitted)—those two words from Dr. Burrows' lengthy report cannot justify rejecting her overall assessment. *See, e.g.*, *Punzio v. Astrue*, 630 F.3d 704, 711 (7th Cir. 2011) (criticizing an ALJ for "cherry-picking [a treating source's] file to locate a single treatment note that purportedly undermines her overall assessment of [the claimant's] functional limitations"). Moreover, Dr. Burrows testified unequivocally that Johnson's significant issues in working memory persisted even when she was on medication.

Other objective medical evidence supports Dr. Burrows' opinion. For example, at the administrative hearing Dr. Burrows indicated that Johnson's fine motor deficit also impacted her ability to keep pace. Dr. Burrows referred to the January 2018 occupational therapy evaluation that revealed Johnson, then almost eighteen years old, had the motor proficiency of a six- or seven-year-old (or, as Dr. Burrows put it, Johnson was operating at about fifty percent capacity in terms of her fine motor skills). Like Dr. Burrows' therapy records, the ALJ discussed the occupational therapy records earlier in his decision but not when evaluating whether Dr. Burrows' opinion was supported by medical findings. The Commissioner argues that the occupational therapy testing is inconsistent with Dr. Burrows' statement during the first day of testing in 2018 that Johnson's observed motor behavior was "basically unremarkable." Maybe so, but the ALJ did not cite that apparent inconsistency in his decision and, if he did, it could be criticized as impermissible cherry-picking. Moreover, the battery of tests Dr. Burrows put Johnson through did not seem to test her motor functioning, and Dr.

Burrows' report following that testing indicated that Johnson should continue with occupational therapy services to help improvement fine motor strength, coordination, and dexterity.

Because Dr. Burrows supported her opinion with objective medical findings, the social security regulations compelled the ALJ to give the opinion controlling weight unless it was inconsistent with other substantial evidence. The only "inconsistent" evidence the ALJ cited was the form Dr. Burrows submitted in support of Davis' guardianship application. The ALJ noted that Dr. Burrows used the findings from the 2018 evaluation when she completed the guardianship form and that Dr. Burrows indicated on the form that Johnson's impairments did not result in any "severe" functional limitations. The upshot appears to be that the ALJ thought Dr. Burrows' hearing testimony was inconsistent with the findings on the guardianship form. But, as the ALJ acknowledged, the functional areas on the guardianship form do not directly correlate with the functional domains used to assess mental disorders in social security cases, and the four-point scale used to assess the degree of limitation in each category is not necessarily comparable to the five-point rating scale described in the listings. Thus, the fact that Dr. Burrows indicated on the guardianship form that Johnson had only a "moderate" limitation in attention/concentration—with no explanation of what a moderate limitation means in that context—does not substantially contradict the specific functional limitations Dr. Burrows offered at the hearing.

Furthermore, the ALJ overlooked the extent to which Dr. Burrows' opinion regarding reduced work pace was consistent with the opinions of other medical sources who treated Johnson. *See, e.g.*, *Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018). Dr. Wilson, another one of Johnson's former treating psychologists, opined that Johnson's difficulties persisting

with tasks and maintaining work pace/efficiency would result in her being fifty percent as efficient as an average worker. R. 816. Johnson's pediatrician, Dr. Baker-Franckowiak, predicted that Johnson would be less than fifty percent as efficient as an average worker. R. 828. And Bullis, Johnson's occupational therapist, pegged Johnson at seventy percent as efficient. R. 822. Each of those opinions is consistent with Dr. Burrows' testimony that Johnson would be more than thirty percent less productive than the average worker.

Even if the ALJ had offered good reasons for not giving controlling weight to Dr. Burrows' opinion about work pace, he still had to weigh that opinion in accordance with the checklist factors in § 416.927(c). Although the ALJ indicated that he considered the opinion evidence in accordance with § 416.927, his decision does not explicitly address the checklist factors vis-à-vis Dr. Burrows' opinion. The Commissioner correctly notes that the ALJ discussed several gaps in Johnson's treatment with Dr. Burrows. But those gaps in treatment do not show that Dr. Burrows had a limited treatment relationship with Johnson. Dr. Burrows conducted two lengthy evaluations of Johnson (the first in July 2015, and the other in June 2018), the second of which spanned two days. Also, the most recent treatment notes indicate that Dr. Burrows saw Johnson at least nine times in the eight months preceding Burrows' retirement in January 2019. Dr. Burrows therefore had a lengthy and extensive treatment relationship with Johnson. *See* § 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

The other factors suggest that the ALJ should have given Dr. Burrows' opinion great weight. We already discussed medical findings supporting Dr. Burrows' opinion, *see* § 416.927(c)(3), and the opinion's consistency with the opinions of Johnson's other medical

19

providers, *see* § 416.927(c)(3). Also, Dr. Burrows was a pediatric psychologist, *see* § 416.927(c)(5), and her findings remained relatively consistent throughout the course of her treatment, *see* § 416.927(c)(4). Dr. Burrows' opinion regarding work pace also seemed at least somewhat consistent with the fact that Johnson received fifty percent more time than her classmates to complete tests. *See, e.g.*, R. 565 (indicating that, during her junior year, Johnson was given time-and-a-half on all tests that took more than thirty minutes to complete). Thus, "[p]roper consideration of these factors may have caused the ALJ to accord greater weight to [Dr. Burrows'] opinion." *Campbell*, 627 F.3d at 308.

## II.  The ALJ Erred by Failing to Address Dr. Burrows' Opinion that Johnson Would Need Extra Supervision in a Full-Time Work Setting

The ALJ did not address Dr. Burrows' opinion that Johnson would need a tremendous amount of support to keep her on task if placed in a job requiring simple, repetitive tasks. The Seventh Circuit has repeatedly held that administrative error like the one here is subject to harmless-error review and that remand is not required if the reviewing court "can predict with great confidence that the result on remand would be the same." *Schomas v. Colvin*, 732 F.3d 702, 707–08 (7th Cir. 2013) (citing *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011); *Parker v. Astrue*, 597 F.3d 920, 924 (7th Cir. 2010); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *Keys*, 347 F.3d at 994–95). "[T]he harmless error standard is not . . . an exercise in rationalizing the ALJ's decision and substituting [the reviewing court's] own hypothetical explanations for the ALJ's inadequate articulation." *McKinzey*, 641 F.3d at 892. Rather, the question for a reviewing court "is now prospective—can [I] say with great confidence what the ALJ would do on remand—rather than retrospective." *Id.*

I cannot predict with great confidence that the result would be the same once the ALJ considers this opinion. First, Dr. Burrows' opinion about the need for extra supervision is

20

well-supported by other evidence in the record. For example, there are many references in the record to Johnson needing reminders and verbal cueing to stay on task. *See, e.g.*, R. 273 ("She needs constant reminders to stay on task and focused."), R. 561 ("She needs reminders to stay focused on what she needs to do in school."), 721 ("patient required verbal cueing" while playing shell collecting game during occupational therapy), 791 (Johnson needed "maximal verbal cueing" during cleaning exercise in occupational therapy). Johnson also had a successful experience working part-time during the summer of 2016 with a job coach. *See* R. 553. And, like Dr. Burrows, both Dr. Wilson and Dr. Baker-Franckowiak opined that Johnson would need extra supervision in a work setting. *See* R. 819 (Dr. Wilson: "With exceptional structure, Makenzie can be successful but the level of support and accommodation require is high."), 831 (Dr. Baker-Franckowiak: "Patient may be able to sustain a part-time job with high levels (1:1) of supervision but is unlikely, at her current level of functioning (which has persisted for several years), to be able to maintain a full-time job in a situation with typical supervision levels."). Second, Johnson's apparent need for extra supervision conflicts with the ALJ's assessed RFC, which limits Johnson to only brief and superficial contact with supervisors and co-workers. Based on the record before me, I cannot say that the ALJ's failure to address Dr. Burrows' opinion about vocational support was harmless.

## III.    The ALJ's Error Requires Remand, Not an Award of Benefits

The ALJ's failure to give controlling or great weight to Dr. Burrows' opinions was an error requiring remand. "When a reviewing court remands to the Appeals Council, the ordinary remedy is a new hearing before an administrative law judge. In unusual cases, however, where the relevant factual issues have been resolved and the record requires a finding

of disability, a court may order an award of benefits." *Kaminski*, 894 F.3d at 875 (collecting cases).

This is not one of those unusual cases. First, as Johnson concedes, the ALJ did cite at least *some* evidence that appears inconsistent with Dr. Burrows' opinion. Second, Johnson has not explained how fully crediting Dr. Burrows' opinions would entitle her to benefits prior to turning eighteen. Finally, unlike in *Kaminski*—the case Johnson primarily relies upon—the record here does not compel a finding of disability if the treating source's opinions were given controlling or great weight. The vocational expert testified that the laundry worker job would not be available to someone who was more than ten percent less productive than the average worker, but she was not asked how such a limitation would affect the factory helper job.[5] Also, the expert did not provide *any* testimony about how needing extra supervision would affect the hypothetical person's job prospects. Without that testimony, I cannot conclude that Johnson would be unable to sustain all full-time employment and, thus, the appropriate remedy is to remand, not award benefits.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ committed reversible error in evaluating the medical opinions of Johnson's treating psychologist. Thus, I **REVERSE** the Commissioner's decision and **REMAND** this action to the Commissioner pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for further proceedings consistent with this decision. On remand, the Commissioner should also address

---

[5] It's unclear if the expert's testimony about "off-task" behavior is the same as a loss in productivity; the medical assessment forms completed by Johnson's other providers drew a distinction between those two concepts. *See* R. 816, 822, 828.

22

Johnson's other claimed errors relating to the ALJ's weighing of the other opinion evidence in the record. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 3rd day of December, 2021.

STEPHEN C. DRIES
United States Magistrate Judge